Filed 12/4/24  P. v. Hampton CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083234 |
| v. | (Super.Ct.No. BAF2001115) |
| RICHARD SHANE HAMPTON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Samah Shouka, Judge. Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Richard Shane Hampton was being housed at the Larry D. Smith Correctional Facility awaiting trial; he and two other inmates targeted the

1

victim after discovering he was awaiting trial on child molestation charges. All three inmates waited for a security check to be completed and then Hampton's cohort put blankets up to obscure a set of bunk beds. The three then assaulted the victim and left him dead on his bunk covered in a sheet. Surveillance video showed the assault. The victim died as a result of strangulation. Defendant was convicted of one count of first degree murder.

Defendant, relying on the recent California Supreme Court decision in *People v. Brown* (2023) 14 Cal.5th 453 (*Brown*), claims that the jury was erroneously instructed on the theory of lying in wait first degree murder requiring reversal of his conviction.

## PROCEDURAL HISTORY

Defendant was convicted of first degree murder within the meaning of Penal Code section 189, subdivision (a).[1] In a bifurcated proceeding, the trial court found true that defendant had suffered one prior serious felony conviction, and one prior serious and/or violent felony conviction (§§ 667, subd. (a), (c) & (e)(2)(A), 1170.12, subd. (c)(2)(a)).[2] Defendant was sentenced to 50 years to life, plus a determinate sentence of five years, to be served in state prison.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was additionally charged with the special allegation of intentionally killing the victim while lying in wait (§ 190.2, subd. (a)(15)) but the jury found the allegation not true.

# FACTUAL HISTORY

A.    PROSECUTION CASE-IN-CHIEF

Riverside County Sheriff's Deputy Zackary Carter was assigned to the Larry D. Smith Correctional Facility (jail) in September 2020 and knew defendant, who was an inmate. Deputy Carter explained that when inmates wanted to make phone calls from the jail, they had to use a specific number to identify who was making the call. All calls were monitored and recorded.

Deputy Carter reviewed defendant's phone calls on September 5, 2020. Defendant made a phone call to his mother at 8:16 p.m. Defendant told his mother he needed her to look somebody up and it was "really, really important." He spelled out the name "Roseno [*sic*] Echevarria." The time for the call was almost up (inmates were only allowed to make 15-minute calls) and defendant's mother was still looking up the name. She told defendant to call her the next day but he told her "I need to know this real soon." They agreed that defendant would call her back in five minutes. Another call was made by defendant to his mother at 8:42 p.m.[3]

On September 8, 2020, defendant was housed in Housing Unit 14. Jason Barton and Aaron Aubrey were also inmates in the same housing unit. Rosendo Echevarria was also an inmate in the same housing unit.

Deputy Adrienne Morrow was working at the jail on September 8, 2020. He indicated that inmates at the jail were housed in different dayrooms. The dayrooms had

---

[3] The transcript for this call has not been made a part of the record on appeal.

several bunk beds where the inmates slept. They did not stay in separate cells. Deputies did not stay in the dayrooms all the time; they did security checks every hour. Security cameras recorded all the time in the dayrooms.

On September 8, 2020, at 8:00 p.m., Deputy Morrow was working at the switchboard in charge of opening and closing security doors. He was in a separate room that had windows looking out into the different dayrooms. He was doing several things at this time and was not looking into the dayrooms at all times. At 8:33 p.m., an inmate in the dayroom where defendant, Aubrey, the victim, and Barton were housed attempted to get Morrow's attention. Morrow told the inmate to give him a minute. The inmate got his attention again, making a motion with his eyes and surreptitiously pointed to another part of the dayroom. He looked to the area and saw that a blanket was draped over a bunk bed, obscuring the lower bunk. There was a rule that blankets were not to be draped over bunks.

Deputy Morrow enlisted Deputy Zachary Johnson to go into the dayroom to check. Deputy Johnson entered the dayroom and went to the bunk bed that had a blanket draped over it. He moved the blanket and found the victim face down on the bunk covered with a sheet. The victim was not breathing and had a "blueish-purplish" color to him. He had blood on his clothes and had no pulse. CPR was performed on the victim but it was not successful and he was pronounced dead.

Video surveillance from the dayroom starting at 7:40 p.m. was shown to the jury. Defendant was with Barton. Barton was then seen sitting on a bunk bed talking with Aubrey. At 7:46 p.m., defendant, Barton, and Aubrey were all together in the dayroom.

4

A security check was conducted by one of the correctional deputies at 7:55 p.m. At 8:09 p.m., Aubrey hung a blanket over one of the bunk beds. He then hung a blanket on another bunk bed. At 8:12 p.m., the victim could be seen sitting at a table in the dayroom. He was seen near the covered bunk beds at 8:15 p.m. Defendant could be seen heading between the covered bunk beds at 8:17 p.m. Defendant and the victim appeared to be having a conversation. Barton moved to the area near defendant and the victim at 8:18 p.m. Movement could be seen between the two bunk beds.

The victim escaped out from between the two bunk beds and Aubry chased him to a wall in the back of the dayroom. Aubrey assaulted the victim in the back of the room. Defendant and Barton emerged from the covered bunk beds. At 8:20 p.m., the victim was on the ground in the back corner of the dayroom. Barton was standing nearby but defendant and Aubrey could not be seen. Barton went to wash his hands. At 8:22 p.m., defendant washed his hands. Defendant went back by the bunk beds. Barton could be seen cleaning the back of the room with a towel. Aubrey emerged from the area of the bunk beds at 8:28 p.m. and had removed his orange jumpsuit. At 8:34 p.m., defendant again washed his hands. Deputy Johnson entered the dayroom at 8:37 p.m. Defendant was on another bunk bed. He took off his socks and threw them aside.

Deputy Johnson immediately asked for medical help for the victim. Several other deputies came to assist and paramedics arrived. All the other inmates were removed from the dayroom.

Deputy Alvin Calhoun was working in the intake area of the jail at 3:48 a.m. on September 9, 2020. Defendant came into the area waiting to be seen by medical staff.

5

Deputy Calhoun was aware of the incident in the dayroom. Defendant asked Deputy Calhoun "How you doing?" Deputy Calhoun responded, "Alright, better than you." Defendant responded "I'm perfect," and "I'm doing fine." Deputy Calhoun asked for defendant's identification number. He then asked defendant, "You good?" Defendant responded, "I made the world a safer place." Deputy Calhoun said, "Yeah." Defendant continued, "for the children anyway."

Justin Rinkert was a fraud investigator for San Bernardino County but previously was employed as a Riverside County deputy sheriff. He was assigned to the jail as an investigator in September 2020 and investigated the victim's death. He obtained the surveillance video for the dayroom and also for a nearby exercise room where the inmates were moved after the victim's death.

In the video surveillance, he observed defendant, Barton, and Aubrey put the victim on the bunk bed and cover him. The footage also showed defendant standing between the two covered bunk beds keeping the victim from leaving the area. Defendant and Barton both appeared to be assaulting defendant on the bunk beds. The victim momentarily escaped but was chased by Aubrey. The victim then fell to the ground. Defendant, Barton, and Aubrey were all in the area by him.

The video surveillance from the exercise room showed defendant and Aubrey hugging other inmates after the victim was found dead. It appeared they were being congratulated. Aubrey and defendant could be seen hugging and shaking hands. At 8:41 p.m. defendant could be seen taking off his pants and dropping them behind a wall.

6

Rinkert noted that the assault occurred shortly after a correctional deputy had completed the hourly security check. This was significant to Rinkert in that it appeared the parties preplanned the assault and were waiting for the security check to be completed to begin their attack. Other evidence that the assault was planned was Aubrey putting up the blankets. Rinkert indicated there were jail politics among inmates. It was permissible for an inmate to commit violent acts against another inmate who has committed crimes against children, specifically molestation. The victim was incarcerated on charges of sexual molestation of a child.

An autopsy was performed on the victim on September 15, 2020. The victim had bruises, contusions, and scrapes all over his body. He had blunt-force injuries to his head. He had signs on his neck and in his eyes of strangulation. His windpipe was fractured and all the muscles in his neck were bruised. He had brain hemorrhaging. The cause of death was strangulation.

B.    DEFENSE

Defendant presented no evidence on his behalf.

**DISCUSSION**

Defendant contends the standard instruction given on first degree murder, CALCRIM No. 521, was erroneous because it omitted the mental state element required to prove lying in wait for first degree murder. Relying on *Brown*, *supra*, 14 Cal.5th 463, he insists that missing from the jury instruction was the requirement that while he was lying in wait, he harbored a state of mind more culpable than the malice required for a second degree murder conviction. Defendant further contends the trial court

7

compounded the error when the jury asked a question about first degree lying in wait murder and they were referred back to CALCRIM No. 521.

A. ADDITIONAL FACTS

The prosecutor argued that the instructions included CALCRIM No. 521, first degree murder, under the theories of willful, deliberate, and premeditated murder, as well as lying in wait. The prosecutor noted that the difference between lying in wait under CALCRIM No. 521, and the special circumstance, was that implied malice murder could be elevated to first degree even without the intent to kill the victim. Defense counsel made no objections to the instructions or the theories of murder proposed to be argued by the prosecutor in closing.

The jury was instructed on express and implied malice theories of murder (CALCRIM No. 520). Relevant here, they were instructed on implied malice as follows: "The defendant had implied malice if he . . . intentionally committed the act or failed to act; [¶] Two, the natural and probable consequence of the act or failure to act or dangerous to human life; [¶] And, three, at the time he acted or failed to act, he knew his act or failure to act was dangerous to human life; [¶] And, four, he deliberately acted or failed to act with conscious disregard for human life."[4] The jury was instructed with CALCRIM No. 521 as follows: "The defendant has been prosecuted for first-degree murder under two theories: [¶] One, that he acted willfully and deliberately and with

---

[4] We note that CALCRIM No. 520 was amended effective March 2024 to require that "the natural and probable consequences of that act involved a high degree of probability that it would result in death." Defendant has made no argument that the change to the instruction impacts this case and we will not make such argument for him.

premeditation; [¶] And two, that he acted while lying in wait." The instruction further provided the definition of premeditated and deliberate murder, and CALCRIM No. 520 provided the definitions of express and implied malice.

CALCRIM No. 521 also provided the definition of first degree murder while lying in wait. It provided, "Additionally, the defendant is guilty of first degree murder if the People have proved that the defendant committed murder while lying in wait or immediately thereafter. The defendant committed murder by lying in wait if, one, he conceals his purpose from the person killed; [¶] Two, he waited and watched for an opportunity to act; [¶] And, three, . . . from a position of advantage, he intended to and did make a surprise attack on the person killed. The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. [¶] Deliberation means carefully weighing the considerations for and against a choice, and knowing the consequences, deciding to act. . . . [A]n act is done with premeditation if the decision to commit the acts is made before the act is done. A person can conceal his or her purpose even if the person killed is aware of the person's physical presence. The concealment can be accomplished by ambush or some other secret plan."

During deliberations, the jury asked, "If a second degree murder charge is believed to be lying in wait, does this change the charge to one count of first degree murder?" The trial court and the parties addressed the question off the record. The trial court, though, noted on the record, "As we all interpret this, the answer would be yes." The trial court proposed to refer the jury to CALCRIM No. 521 and all parties agreed. The written

9

response to the jury was "Instruction 521 explains the law that applies to first degree murder."

B.        ANALYSIS

"A trial court must instruct on each element of a charged offense, even when the defendant does not propose a complete instruction or object to the court's failure to provide one." (*Brown*, *supra*, 14 Cal.5th at p. 461.) " 'To prove first degree murder of any kind, the prosecution must first establish a murder within section 187—that is, an unlawful killing with malice aforethought.' " (*People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1262.)

Malice is expressed when there is an intent to unlawfully kill. (§ 188, subd. (a)(1).) "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152.) " 'Wanton disregard for human life' " and " ' "conscious disregard for human life" ' " articulate the same standard for implied malice. (*Id*. at p. 152.) " 'Ordinarily, . . . [an implied malice] killing would be murder of the second degree. However, if this murder is perpetrated by means of lying in wait, it is, by statutory definition, murder of the first degree.' " (*People v. Maldonado*, *supra*, 87 Cal.App.5th at pp. 1262-1263; § 189, subd. (a)).)

"All that is required of lying in wait is that the perpetrator exhibit a state of mind equivalent to, but not identical to, premeditation and deliberation. [Citation.] This state

10

of mind simply is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in order to facilitate the act which constitutes murder." (*People v. Laws* (1993) 12 Cal.App.4th 786, 795 (*Laws*).) "The act of lying in wait with secret purpose in order to gain advantage and take a victim unawares is particularly repugnant and of aggravated character so as to justify harsher punishment when the lying in wait results in murder, *even if the waiting and watching were not done with the intent to kill or injure*." (*Id.* at p. 793, italics added; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148 [" '[M]urder by means of lying in wait requires only a wanton and reckless intent to inflict injury likely to cause death . . ." as opposed to the lying in wait special circumstance which requires an intent to kill].) In *Laws*, the court rejected a similar claim as raised by defendant that there was instructional error by not advising the jury that it had to find a particular mental state while a defendant was lying in wait, concluding "nothing in section 189 requires the lying in wait to have been done with the intent to kill. Likewise, nothing in the statute requires the lying in wait to have been done with the intent to injure." (*Laws*, at p. 794.)

Defendant relies on *Brown*, *supra*, 14 Cal.5th 453, contending the jury had to be instructed that first degree lying in wait murder required a state of mind more culpable than the malice required for a second degree murder conviction. He insists that CALCRIM No. 521 omitted an element of the offense and requires reversal of his first degree murder conviction. Although defendant does not clearly state what the jury instruction should have been, it appears he is arguing that while lying in wait, he had to possess the mental state of a wanton and reckless intent to inflict injury likely to cause

11

death, rather than just at the time when he committed the murder. *Brown* does not support his contention.

In *Brown*, *supra*, 14 Cal.5th 453, the defendant was charged with first degree murder under section 189 by means of poison for breastfeeding her baby while taking methamphetamine. The baby died with traces of methamphetamine in her system. The court found, as a matter of first impression, that to elevate murder from second degree to first degree murder by means of poison, the People must show the defendant deliberately gave the victim poison with intent to kill or inflict injury likely to cause death. (*Brown*, at pp. 456-457)

The *Brown* court reviewed the history of section 189 and the mental state required for the other means of first degree murder, lying in wait, and torture. The court stated, in assessing the language of section 189, "We previously have interpreted this language to require proof of a mental state more culpable than the malice required for second degree murder, in keeping with the Legislature's determination that murders perpetrated by these means warrant the greater punishment reserved for first degree murder. For torture murder, the prosecution must show 'wilful, deliberate and premeditated intent to inflict extreme and prolonged pain.' [Citation.] For lying in wait murder, the prosecution must show the defendant performed the acts of watching, waiting, and concealment with the intent to take the victim by surprise to facilitate the infliction of injury likely to cause death. [Citation.] However, since in a typical first degree murder by poison case there is no question that the defendant acted with willfulness, deliberation, and premeditation, we have never addressed whether there is a mental state component of first degree poison

12

murder.  We now clarify that to prove a murder by poison is in the first degree, the prosecution must show that the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause death."  (*Brown*, *supra*, 14 Cal.5th at pp. 456-457.)  It further noted that "This case brings to light the need for us to elaborate on the meaning of the phrase 'murder . . . perpetrated by means of . . . poison,' just as prior cases have required us to elaborate on the meanings of 'torture' and 'lying in wait.' "  (*Brown*, *supra*, 14 Cal.5th at p. 466.)  The *Brown* court concluded that "the trial court was required to instruct the jury that to find Brown guilty of first degree murder, it had to find that she deliberately gave her newborn daughter poison with the intent to kill her or inflict injury likely to cause her death.  Its failure to so instruct was error." (*Brown*, *supra*, 14 Cal.5th at p. 472.)

The *Brown* court made it clear that it had already resolved the issue of intent for lying in wait first degree murder, finding, " '[I]t is not sufficient to merely show the elements of waiting, watching and concealment.  It must also be shown that the defendant did those physical acts with the intent to take [the] victim unawares and for the purpose of facilitating [the] attack.' [Citations.]  We have also established that the defendant must act with a ' "wanton and reckless intent to inflict injury likely to cause death," '[citation] and the period of lying in wait must be sufficient to show that the defendant had ' " 'a state of mind equivalent to premeditation or deliberation' " ' [citation].  Only upon these specific showings of the defendant's mental state in lying in wait do we consider the defendant to have acted with 'the functional equivalent of' a premeditated, deliberate intent to kill [citation], such that 'no further evidence of premeditation and deliberation is

13

required in order to convict the defendant of first degree murder' [citation.]." (*Brown*, *supra*, 14 Cal.5th at p. 465.)

*Brown* never stated there was an additional mental component required while lying in wait different from what it had found in previous cases. The *Brown* court cited to *Gutierrez*, *supra*, 28 Cal.4th 1083, which addressed the differences between lying in wait first degree murder and the special circumstance of lying in wait. The *Gutierrez* court specifically noted that the lying in wait first degree murder only required a "wanton and reckless intent to inflict injury likely to cause death." (*Id.* at pp. 1148-1149.) On the other hand, the special circumstance required an intentional murder. *Gutierrez* also noted, "the lying-in-wait special circumstance requires 'that the killing take place during the period of concealment and watchful waiting, an aspect of the special circumstance distinguishable from a murder perpetrated by means of lying in wait, or following premeditation and deliberation." (*Id.* at p. 1149.) The *Gutierrez* court did not establish that the defendant must have a specific additional mental state while lying in wait for first degree murder.

The *Brown* court also cited to *Laws*, *supra*, 12 Cal.App.4th 786. (*Brown*, *supra*, 14 Cal.5th at p. 465.) As stated, in *Laws*, "[a]ll that is required of lying in wait is that the perpetrator exhibit a state of mind equivalent to, but not identical to, premeditation and deliberation. [Citation.] This state of mind simply is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in order to facilitate the act which constitutes murder. [Citation.] It does not include the intent to kill or injure the victim." (*Laws*, *supra*, 12 Cal.App.4th at p. 795.)

14

There is no additional requirement that, while lying in wait, a defendant had to have a wanton and reckless intent to inflict injury likely to cause death. He must though possess such intent while committing the act resulting in the murder of the victim, which the jury here concluded based on its finding of implied malice second degree murder.[5] The additional element of lying in wait that elevates the murder from second degree murder to first degree murder is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares. (*Laws*, *supra*, 12 Cal.App.4th at p. 795.) Nothing in *Brown* requires that a defendant have the mental state during the period of watching and waiting. As stated, "[N]othing in section 189 requires the lying in wait to have been done with the intent to kill . . . [or] the intent to injure." (*Laws*, *supra*, 12 Cal.App.4th at p. 794.) The *Brown* case referred to both *Laws* and *Gutierrez* with approval. Hence, the reasoning in *Laws* applies, which does not require the additional mental state proposed by defendant.

CALCRIM No. 521 properly advised the jury of the elements of first degree murder on a theory of lying in wait. As such, the trial court properly directed the jury to the instruction in response to their question. No instructional error occurred in this case.

---

[5] Although the jury could have found defendant guilty on a theory of premeditated and willful first degree murder, based on their question, and it finding the special circumstance not true, it does appear it relied on the first degree lying in wait theory of murder in convicting defendant.

## DISPOSITION

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

                                        J.

We concur:

RAMIREZ _____

                     P. J.

RAPHAEL _____

                   J.